**Bobbi MILLER, Plaintiff,**

v.

**The DEPARTMENT OF CORRECTIONS OF the STATE OF ILLINOIS, Defendant.**

**No. 95–3234.**

United States District Court, C.D. Illinois, Springfield Division.

March 1, 1996.

Mary Lee Leahy, Springfield, IL, Scott C. LaBarre, Denver, CO, for plaintiff.

Guy A. Studach, Springfield, IL, for defendant.

### OPINION

RICHARD MILLS, District Judge:

A tragic story.

A car accident left the Plaintiff blind.

Her employment as a correctional officer was terminated.

Unfortunately, the Americans with Disabilities Act provides no relief.

## I. Background

Bobbi Miller began her employment as a correctional officer with the Illinois Department of Corrections ("DOC") on April 11, 1988. She began her employment at the Lincoln Correctional Center and was subsequently transferred to the Graham Correctional Center.

In June of 1986, Miller was injured in an automobile accident and sustained severe head injuries. In the summer of 1993—as a result of the head injuries—Miller experienced substantial loss of vision. Consequently, Miller was placed on indefinite medical leave upon the recommendation of Dr. Gary Blackman, an optometrist. In July and August of 1993, and January of 1994, Miller was examined by her treating physician, Dr. David Gelber—a neurologist at the Southern Illinois University School of Medicine. Dr. Gelber determined that Miller had approximately 20/800 vision; thus, in the words of Dr. Gelber, she was "essentially blind in both eyes." Dr. Gelber also believed Miller's blindness was permanent.

In the Fall of 1993, Miller expressed an interest in returning to work at the Graham Correctional Center. On March 16, 1994, Miller met with Kenneth P. Dobucki—Warden of the Graham Correctional Center—to discuss the possibility of returning to work at the DOC. After listening to Miller's suggestions, Warden Dobucki expressed concerns about a severely visually impaired individual working in the DOC and stated that he would have to discuss the matter with Central Management.

On March 31, 1994, Miller received a letter from Warden Dobucki notifying her that her request to return to a correctional officer position was denied. Warden Dobucki indicated that a visually impaired correctional officer would pose a threat to the safety and security of the facility. Warden Dobucki noted further that due to her visual impairment, Miller could not perform a substantial or significant portion of her regularly assigned duties as a correctional officer; thus, she was terminated effective April 15, 1994.

In May of 1994, Miller filed a contract grievance with the State of Illinois Department of Central Management Services. The hearing officer found that no contract violation had occurred. That issue is now on its fourth and final appeal.

In August of 1995, Miller initiated the instant case alleging that the DOC violated the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., by refusing to allow her to return to work as a correctional officer.

## II. Legal Standard—Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## III. Discussion

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

■ Accordingly, in order to recover under the ADA, the plaintiff must establish three general elements: (1) that he is disabled within the meaning of the ADA; (2) that he is qualified, *i.e.*, he is able to perform the essential functions of the job with or without accommodation; and (3) that the employer terminated him because of the disability. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995).

### A. A Disabled Individual

■ Regarding the first element, an individual is "disabled" if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).[1] "Major life activities" are those activities that the average person in society can perform with little or no difficulty. *Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092, 1100 (S.D.Ga.

1995). Such activities include functions such as walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i). An individual is "substantially limited" in a "major life activity" if he cannot perform the activity or is "significantly restricted" as to the condition, manner, or duration under which he can perform the activity as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1).

■ Here, Miller essentially is blind in both eyes.[2] Thus, she obviously is substantially limited in the major life activity of seeing. Accordingly, Miller has established the first element of an ADA claim—she is disabled for purposes of the ADA.

### B. A Qualified Individual

■ Next, Miller must establish that she is a "qualified individual." To review, in order to be considered a "qualified individual," Miller must show that she can perform the essential functions of the position at issue with or without reasonable accommodation. The position at issue here is that of a correctional officer in the DOC. Accordingly, the next step in the Court's analysis is to determine: (1) the essential functions of the correctional officer position and (2) whether Miller can perform those functions with or without reasonable accommodation.

The "essential functions" are the "fundamental job duties of the employment position" in question. 29 C.F.R. § 1630.2(n)(1). In determining what functions are essential, the Court may consider, among other things:

(1) the employer's judgment as to which functions are essential;

(2) written job descriptions;

(3) the amount of time spent on the job performing the function;

(4) the consequences of not requiring the individual to perform the function;

(5) the terms of a collective bargaining agreement; and

---

1. An individual is also disabled if he has a "record of such an impairment" or is "regarded as having such an impairment." 42 U.S.C. § 12102(2).

2. Miller has informed the Court that an individual is legally blind if he has 20/200 vision. Miller's vision, as reported by Dr. Gelber, is 20/800. Thus, Miller's condition is far worse than a person who is legally blind.

(6) the work experience of past incumbents in the job and/or the work experience of current incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

In general, the DOC asserts that a correctional officer must be able to perform a variety of duties, most involving security measures focusing primarily on assignments associated with the supervision and surveillance of inmates. Thus, according to the DOC, an essential function of the correctional officer position is the *ability* to perform numerous tasks, which primarily involve the supervision and surveillance of inmates. Since a blind individual obviously cannot perform most of those duties, the DOC claims that it did not violate the ADA by terminating Miller.

Miller does not dispute that she cannot perform the vast majority of the duties of a correctional officer, with or without a reasonable accommodation. Miller claims, however, that she can perform the duties associated with the switchboard (telephone) and armory with a reasonable accommodation; thus, she seeks a *permanent* assignment to either or both of those positions. Miller claims further that the DOC cannot argue that an essential function of the correctional officer position is the *ability* to perform numerous duties.

The Court agrees with the DOC.[3]

As explained below, it appears clear to the Court that an essential function of the correctional officer position is the *ability* to perform a wide range of duties, most involving the supervision and surveillance of inmates. As will also be explained below, the Court finds Miller's position is not supported by the case law interpreting the ADA.

### 1. Essential Function of the Correctional Officer Position

■ *First,* as noted above, the DOC—the employer—believes that a correctional officer must be able to fulfill numerous roles within the DOC, most involving the supervision and surveillance of inmates. Thus, it is the professional judgment of the DOC that an essential function of the correctional officer position is the *ability* to fill numerous roles within the facility.

*Second,* the DOC submits a written job description of the correctional officer position effective since June 1, 1992. The job description identifies the correctional officer's various duties—most involving the supervision and surveillance of inmates—and approximates the time expended on each particular duty as follows: [4]

| Correctional Officer Duties | % Of Time |
|---|---|
| 1. Stands guard in housing units, work and program area. Insures proper sanitation and cleanliness; sees that inmates are fed and clothed, properly supervised, and that inmates are properly dispatched from housing units and work/program areas. Insures that any inmate requesting medical attention is sent to the proper facility. Keeps perpetual count on inmates assigned. | 40% |
| 2. Inspects quarters, facilities, and work locations for unauthorized contraband; checks sanitary conditions, fire, and safety hazards, makes reports on irregularities. | 15% |
| 3. Escorts individuals or groups of inmates to work or program assignments; supervises institutional inmate lines such as yard, meals, church, commissary, etc. | 10% |
| 4. May be in charge of visiting rooms, armory, telephone, yard; guard on gates, towers, segregation, hospital, and other posts as assigned; searches inmates; may search visitors. | 10% |

**3.** The DOC also argues that Miller's employment would jeopardize the safety and security of the facility. Because the Court concludes that Miller has not established that she is a qualified individual, the Court makes no finding regarding the DOC's "safety and security" argument.

**4.** The Court is uncertain as to the "% of time" column. As will be discussed, it does not appear that any correctional officer actually performs all of the listed duties. Rather, some are assigned to the same duties continuously. Perhaps, the "% of time" column refers to the amount of time expended on each category of duties by the correctional officers working as a whole—as a group. Regardless, we do not find the resolution of that issue necessary to reach our decision.

| Correctional Officer Duties | % Of Time |
|---|---|
| 5. Shakes down inmates for contraband. Must be familiar with all institutional rules and regulations. Is trained and has the ability to handle institutional firearms. | 10% |
| 6. May supervise inmates on interinstitutional transfers and to courts, being responsible for safe arrival and/or return. | 5% |
| 7. Searches for escapees. Is on call 24 hours a day during any emergency situations such as riots, escapes, other officer absenteeism, etc. | 5% |
| 8. Performs other duties as required or assigned which are reasonably within the scope of duties enumerated above. May serve as a member of the Internal Audit Team. | 5% |

Accordingly, as evidenced by the job description, a correctional officer is expected to have the *ability* to perform numerous roles within the facility, most involving the supervision and surveillance of inmates—further support for the DOC's argument that the *ability* to perform the various duties is an essential function of the correctional officer position.

*Third,* it appears that the collective bargaining agreement ("Agreement") between the DOC and the union recognizes that a correctional officer must be able to fulfill a variety of duties. The Agreement does not address the issue directly, but it appears to the Court that the Agreement implicitly recognizes the various roles a correctional officer must be able to fill. As noted above, Miller wants the DOC to assign her *permanently* to the switchboard and/or armory. *See* Correctional Officer Duties Job Description ¶ 4, *supra.* Miller believes that she can perform those duties with reasonable accommodations. As Miller concedes, however, the consent of the union is necessary to assign a correctional officer to a permanent duty such as the switchboard and/or armory. Accordingly, since—as Miller concedes—the Agreement would be violated if the DOC created a permanent position by isolating any one duty, the Agreement implicitly recognizes that a correctional officer must be able to perform all of the duties. Once again, additional evidence in support of the DOC's argument that the *ability* to perform the numerous duties is an essential function of the correctional officer position.

*Fourth,* prior to Miller's disability, she performed many of the duties listed in the job description. In the words of Miller, she was "assigned to a wide variety of duties," including assignments pertaining to housing units, parameter duty, tower duty, tours, the nursing station, the front desk, the switchboard, and the armory. Thus, based on Miller's testimony, it appears the *ability* to perform the numerous duties is indeed an essential function of the correctional officer position.

In summary, the professional judgment of the DOC, the written job description, the collective bargaining agreement by implication, and Miller's own testimony regarding her prior work experience support the DOC's argument that the *ability* to perform a wide variety of tasks—most involving the supervision and surveillance of inmates—is an essential function of the correctional officer position. Since Miller does not have the *ability* to perform—with or without reasonable accommodation—the vast majority of those tasks (*i.e.,* she does not have the ability to perform the essential function of the position), she has not established that she is a qualified individual for purposes of the ADA.

### 2. Miller's Position

Miller offers a couple of arguments in her attempt to rebut the DOC's argument that the *ability* to perform the numerous tasks is an essential function of the correctional officer position—none of which we find persuasive.

*First,* she claims that there is at least one correctional officer who is disabled and does not have the *ability* to perform many of the tasks associated with the correctional officer position. She identifies that person as Lieutenant Richard Thompson.

At first glance, Miller's argument appears meritorious. That is, if an employer is willing to make concessions—by not terminating an individual who lacks the *ability* to perform the variety of tasks associated with the correctional officer position—for one disabled employee, perhaps the employer

should be required to make concessions for other correctional officers who suffer from other disabilities. In other words, an employer should not be able to pick and choose. If the employer is willing to accommodate one disability, perhaps the employer should be estopped from arguing that he cannot accommodate other disabilities. An interesting issue, but unfortunately the Court cannot address it further since Miller's characterization of the circumstances surrounding Lieutenant Thompson's disability and work responsibilities is factually erroneous.

Based on subsequent evidence submitted to the Court, it appears that Lieutenant Thompson was *never* disabled as that term is utilized for ADA purposes. Rather, unlike Miller, he was *temporarily* injured on a couple of occasions for short periods of time. Miller's condition, on the other hand, is expected to be *permanent*. While Lieutenant Thompson was injured, his duties were indeed limited, *i.e.*, he did not have the *ability* to perform all of the duties of a correctional officer. As Miller concedes, though, Lieutenant Thompson has recovered fully and it appears that he now has the *ability* to fulfill all of his duties.[5] Accordingly, Miller's attempt to draw an analogy between her situation and Lieutenant Thompson's situation is untenable.

*Second,* Miller argues that the DOC essentially creates permanent positions by continuously assigning the same individuals to the same duties. Thus, because individuals are assigned to the same duties over and over again, Miller claims that the DOC cannot argue that an essential function of the correctional officer position is the *ability* to perform the variety of duties listed above.

That argument is a red herring. Noticeably missing from Miller's argument is the suggestion that the individuals who receive the so-called "permanent" assignments lack the *ability* to perform the correctional officer's other listed duties.[6] Thus, although the DOC may continuously assign particular correctional officers to the same duties, it appears each correctional officer nevertheless has the *ability* to perform *all* of the listed duties. Accordingly, unlike Miller, if the correctional officers are needed elsewhere—especially in the event of an emergency—each has the *ability* to perform *all* of the other listed duties.

## C.  Related Issues

Miller offers several related arguments that the Court would like to address.

*First,* Miller claims that she can perform all of the responsibilities of a correctional officer assigned to the switchboard and/or armory with reasonable accommodation. As already noted, however, there are no *permanent* positions within the DOC for a switchboard operator and/or armory supervisor. Rather, as evidenced by the correctional officer job description, duties associated with the switchboard and armory are merely part of the larger correctional officer position that every correctional officer must have the *ability* to perform.

Accordingly, it appears Miller is asking the DOC either to restructure the current correctional officer position by eliminating its essential function pertaining to the *ability* to perform all of the listed duties (which primarily include the supervision of inmates) or to create a new position for her—a position where she would be required to work only at the switchboard and/or ar-

---

**5.** Miller argues that at the time Lieutenant Thompson was injured, no one knew the extent and severity of his injuries. Because the DOC was willing to make concessions for him at that time, Miller claims that the DOC would have continued to make concessions if his injury had been permanent. Such an assertion is nothing more than mere speculation on Miller's part.

**6.** It should be noted that the DOC disputes Miller's contention. However, Miller identifies several officers who, in her opinion, essentially have

been given "permanent" assignments. Those individuals and their alleged "permanent" positions are as follows: (1) O.J. Jansen, assigned to the armory for the past three years; (2) Ron Havron, assigned to segregation control for over eight years; (3) Terry Hiller, assigned to vehicle coordination for at least two years; and (4) Rocky Page, assigned to housing units for ten years. Because this matter is before the Court on the DOC's motion for summary judgment, we will take Miller's version of the facts as true.

mory.[7] However, it is clear under the ADA that an employer is *not* required to restructure a job by eliminating that job's essential functions. *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112–13 (8th Cir.1995) ("An employer need not reallocate the essential functions of a job, which a qualified individual *must* perform.") (emphasis in original); *Haysman*, 893 F.Supp. at 1102 ("The ADA specifically does not require an employer to reallocate essential functions."); *Rucker v. City of Philadelphia*, No. 94–0364, 1995 WL 464312, *3, LEXIS 11104, *7 (E.D.Pa. July 31, 1995) ("Eliminating a major part of the position in question is not required as 'reasonable accommodation' under the ADA.").

It is also equally clear that the ADA does not require the employer to reasonably accommodate the disabled employee by creating a new position. *White*, 45 F.3d at 362; *Rucker*, 1995 WL 464312, *3, LEXIS 11104 at *7 ("[T]he ADA does not mandate that the employer create a 'light duty' or new permanent position."); *Fussell v. Georgia Ports Authority*, 906 F.Supp. 1561, 1573 (S.D.Ga. 1995) ("The [defendant] simply was not required to create a special, 'unarmed police officer' position within the Savannah port complex. . . ."). Thus, Miller's argument is untenable under the provisions of the ADA.

■ *Second*, Miller claims that the DOC refused to consider her for other positions within the DOC. If the employee cannot perform the essential functions of her current position with a reasonable accommodation, reassignment to another *vacant* position may be considered as a reasonable accommodation. 29 C.F.R. § 1630.2(*o*)(2)(ii); *Riley v. Weyerhaeuser Paper Co.*, 898 F.Supp. 324, 327 (W.D.N.C.1995). Since, however, "the ADA does not impose upon an employer the affirmative duty to find another job for an employee who is no longer qualified for the job he or she was doing," *Marschand v. Norfolk & Western Ry. Co.*, 876 F.Supp. 1528, 1542 (N.D.Ind.1995), Miller bears the burden of producing evidence sufficient to establish that accommodation by reassignment was possible. *White*, 45 F.3d at 362–

63; *Haysman*, 893 F.Supp. at 1105 ("Because the plaintiff has the burden of making a prima facie case, he must identify a specific accommodation, in this instance, a specific position which was available and which he could perform."); *Lawrence v. IBP, Inc.*, No. 94–2027, 1995 WL 261144, *7, LEXIS 6118, *19 (D.C.Kan. April 21, 1995) ("Plaintiff has the initial burden of producing evidence sufficient to make a facial showing that accommodation by reassignment was possible.")

■ Accordingly, in order to show that the DOC failed to accommodate her by not offering her another position, Miller must: (1) identify another position; (2) establish that she was qualified for that position, *i.e.*, that she could perform the essential functions of the position with or without reasonable accommodation; and (3) since the ADA does not require that an employer bump other employees or assign an individual to an occupied position, produce evidence that the position was vacant.

Here, Miller's argument falls on all three elements. Indeed, Miller has not identified one position that she could have been reassigned to within the DOC. In her affidavit, Miller states that she offered to fill "some administrative or other role within the facility." But, for some reason, she fails to identify any such positions. And, of course, since she failed to identify any such positions, Miller obviously has not satisfied her burden of establishing that she was qualified for the positions (*i.e.*, that she could perform the essential functions of the positions with or without reasonable accommodation) and, more importantly, that any vacancies existed.

Thus, Miller's allegation that she could perform other jobs within the DOC is merely conclusory. It will not suffice to establish that she was a qualified individual with respect to other jobs and that the DOC failed to reasonably accommodate her by not reassigning her to such positions within the DOC. *White*, 45 F.3d at 362–63; *Marschand*, 876 F.Supp. at 1543 (Plaintiff "has offered nothing beyond his own subjective opinion that he could perform various other jobs at [the Rail-

---

7. As evidence that Miller essentially is asking the DOC to create a new position for her, Miller states in her affidavit that she was "willing to take the officer's uniform off."

road]. This general averment falls far short of [Plaintiff's] summary judgment burden."); *Riley*, 898 F.Supp. at 328 ("Plaintiff has not produced evidence or set forth specific facts raising a genuine issue that he was qualified for any office or administrative position or that such a position was vacant during the relevant time period."); *Haysman*, 893 F.Supp. at 1105 (Plaintiff "fails to establish a genuine issue of fact as to whether he could have been reasonably accommodated through a transfer to the position of scan analyst because he cannot show that such a position was available."); *Weiler v. Household Finance Corp.*, No. 93–C–6454, 1995 WL 452977, *8, LEXIS 10566, *20 (N.D.Ill. July 25, 1995) ("[T]he plaintiff has not produced any evidence that a position was available during the relevant time period."); *Riblett v. The Boeing Co.*, No. 94–1055, 1995 WL 580053 LEXIS 14524 (D.C.Kan. Sept. 22, 1995) (Plaintiff "has failed to prove there were vacant positions at Boeing for which he had the necessary qualifications. Thus, [Plaintiff] has not shown he is a qualified individual as defined by the ADA."); *Lawrence*, 1995 WL 261144 at *7, LEXIS 6118 at *20 ("The record is devoid of evidence sufficient to establish that any of the specific suggested reassignments were reasonable accommodations that IBP could have made for her."); *Vorhies v. Pioneer Mfg. Co.*, 906 F.Supp. 578, 582 (D.C.Colo.1995).

*Third*, Miller claims other disabled individuals are employed by the DOC. She identifies a cook who is totally blind in one eye, a nurse who suffers from multiple sclerosis and uses support cranes to maneuver, and an anonymous individual who also uses support cranes to maneuver (although that position is not identified).

The Court fails to envision how such an allegation is relevant to the Court's inquiry, nor does Miller offer such an explanation. The primary issue before the Court is whether Miller can perform the essential functions of the correctional officer position, with or without reasonable accommodation. Whether other individuals who suffer from *different* disabilities can perform the essential functions of *different* jobs has no bearing on whether Miller can perform the essential functions of a correctional officer position, with or without reasonable accommodation.

*Finally*, Miller claims that the union was willing to waive certain contractual requirements so that she could maintain a permanent position at the switchboard and/or armory. As already discussed, however, the ADA does not require that the employer create new positions or restructure current positions by eliminating the essential functions of the position. As also noted, the switchboard and armory duties are merely a small part of the larger duties that a correctional officer must have the *ability* to perform. There is no position within the DOC for a permanent job at the switchboard or armory. Thus, if the DOC is not willing to create a permanent switchboard or armory position—and since the ADA does not require the creation of such a permanent position—the Court concludes that the union's willingness to waive pertinent contract requirements regarding the creation of such a position is irrelevant.[8]

## IV. Conclusion

A tragic story.

The Court is certainly sympathetic to Miller's plight.

Unfortunately, it does not appear that the ADA provides her with any relief in the instant scenario.

Based on the undisputed factual evidence—including Miller's own testimony—it appears a correctional officer must have the *ability* to perform a wide range of tasks, most involving the supervision and surveillance of inmates.

Thus, the *ability* to perform those tasks is an essential function of the correctional officer position.

8. Of course, if the DOC was willing to create such a position—which undermines the employment agreement—it would need the cooperation of the union. In that instance, the union's conduct would in fact be relevant. Indeed, the DOC would not be able to create such a position unless the union agreed to waive certain contractual provisions. But here, the DOC is *not* willing to create such a position. Thus, whether or not the union is willing to waive certain contractual requirements is irrelevant.

As a blind individual, Miller obviously cannot perform the vast majority of those tasks, with or without reasonable accommodation.

Accordingly, for ADA purposes, she is not a qualified individual with respect to the correctional officer position.

Therefore, the ADA was not violated when the DOC terminated her employment.

*Ergo,* the DOC's motion for summary judgment is ALLOWED.

Case Closed.