**Mary C. ROBB, Plaintiff,**

v.

**HORIZON CREDIT UNION,**
**Defendant.**

**No. 98–2008.**

United States District Court,
C.D. Illinois,
Danville/Urbana Division.

Sept. 14, 1999.

---

Mary Lee Leahy, Leahy Law Offices, Howard W. Feldman, Feldman, Wasser, Draper & Benson, Ellen Schanzle—Haskins, Lipsky & Schanzle–Haskins, Springfield, IL, for Plaintiff.

Clare E. Connor, Thomas Luetkemeyer, Hinshaw & Culbertson, Chicago, IL, Kenneth R. Torricelli, Hinshaw & Culbertson, Champaign, IL, for Defendant.

## ORDER

McCUSKEY, District Judge.

Plaintiff Mary Robb brings this action against her former employer, Defendant Horizon Credit Union ("Credit Union"), based on the Credit Union's decision to fire her in March of 1996. Specifically, she alleges that the Credit Union violated the Americans With Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA"). In addition, Plaintiff alleges a third count of retaliatory discharge under Illinois law. The Credit Union moved for summary judgment on all counts on October 15, 1998(# 23). For the following reasons, that motion is GRANTED as to all counts.

## FACTUAL BACKGROUND

Until March of 1996, Plaintiff worked for the Credit Union. At that time, Steve Senger ("Senger") was its president, but Plaintiff reported directly to the Credit Union's comptroller, Craig Althoff ("Althoff").

In the years leading up to 1996, Plaintiff suffered from depression intermittently, and was treated by her general physician with anti-anxiety drugs. Although Plaintiff had generally been able to manage her depression and stress, she lost that ability sometime in late 1995. At that time, her husband had been on strike for many months, causing him to become physically and verbally abusive. In addition, Plaintiff was raising her young grandson. To make matters worse, Plaintiff was upset to learn that her son, who was serving in the military, would soon be shipped to Bosnia.

That month, Plaintiff's doctor diagnosed her with depression, and referred her to a psychiatrist, Dr. Rohi Patil. Dr. Patil noted that Plaintiff was suffering from a stressful personal life, sleeplessness, vom-

iting, diarrhea, and migraine headaches. He also noted that she was suicidal, and put her in the hospital. Thus, on January 2, 1996, Plaintiff's husband informed the Credit Union that Plaintiff had been hospitalized and would be unable to return to work for some time.

During Plaintiff's hospitalization, Senger called Dr. Patil to ask him when Plaintiff could return to work. He also called Plaintiff to ask whether her illness was work-related, and to find out how long she would be in the hospital. Plaintiff felt that during this call, Senger was angry and annoyed with her, and his tone scared her. Eight days later, Plaintiff spoke with Senger again, and they discussed Plaintiff's medical leave and vacation benefits.

At some point after Plaintiff went on medical leave, Senger asked Althoff to document his conversations with Plaintiff. Althoff could not recall ever making notes like that for any other employee, but he complied with Senger's request. He recalled that Senger made this request sometime after Althoff told Senger that Plaintiff's doctor had referred her to a psychiatrist.

On January 26, 1996, Plaintiff was discharged from the hospital, but returned a few days later for previously scheduled bladder surgery. By March 11, Plaintiff's situation had improved, and she returned to work. Plaintiff asserts that at that time, she was able to perform all of the tasks of her job, but was still taking medication to treat her depression. Upon her return, her co-workers did nothing to welcome her back, and instead gossiped that Plaintiff had suffered a "nervous breakdown." Although Senger and Althoff had talked about making Plaintiff's return to work normal, they did nothing to ensure that the other employees would make her comfortable. Senger recalled saying hello to her that first day back, but nothing else.

On March 15, Plaintiff went to a coworker's office to discuss work, and spoke with her for about five minutes. At some point, after the conversation turned to grandchildren, Senger appeared. Within seconds, he told Plaintiff to go back to her department. Later that afternoon, Senger scolded Plaintiff for having a personal conversation at work, and warned her not to do it again. He then ordered her to write a memorandum stating that she understood this direction. Plaintiff asked Senger to allow her to wait until the next morning to write the memorandum, but he insisted that it be done that day. When she gave him the memorandum later that day, Senger was not satisfied, and told her so.

Shortly after that incident, Althoff showed Plaintiff telephone records and asked her to explain certain calls she had received on the Credit Union's toll-free line during the last three months of 1995. Plaintiff admitted that she received a personal call from her son. Senger also reviewed the records, but did not look to see whether other employees had made personal calls as well. He knew that Plaintiff's son had business with the Credit Union, and that some of his calls might have been related to that business rather than to personal matters. Moreover, Senger knew that other employees received personal calls at work on the toll-free number. In those instances, the employee would simply reimburse the Credit Union for the cost of the call. Senger did not know whether Plaintiff had paid for the one call she admitted was personal.

The following week, Plaintiff had a doctor's appointment scheduled during business hours. In advance of the appointment, Althoff gave Plaintiff permission to leave work early that day and make up the time by coming in early the following morning, a privilege that workers in Althoff's department frequently enjoyed. When Senger learned of this arrangement, however, he overrode Althoff's decision, even though he knew that other employees were allowed comparable privileges. In addition, around that time, Senger changed Plaintiff's lunch hour, even though Plaintiff had been taking her lunch at the same time for years.

On March 25, Senger and Althoff met with Plaintiff. Senger told Plaintiff that they had come to a "crossroads," and that he did not like the memorandum she had written earlier that month. He then gave her three options: write a memorandum of apology, resign, or be terminated. Plaintiff wrote the memorandum. The next day, Senger called Plaintiff into his office. Senger was upset with her second memorandum, which stated that Senger made her write it to avoid being fired. He told her to gather her personal belongings and return her keys, and that he was firing her.

In his deposition, Senger admitted that he knew of no instance since her return that month in which Plaintiff was late, had been rude, or had not gotten along with co-workers. He also had no indication that she had not been loyal to the Credit Union or had a bad work attitude. Nevertheless, he issued no warning, nor did he ask Althoff for his opinion before firing Plaintiff. He stated that he did this because the second memorandum was unsatisfactory, and because he and Plaintiff had a "personality conflict."

Althoff disagreed with Senger's decision to fire Plaintiff. He recalled only two instances during his direct supervision of Plaintiff in which he found problems with her work. The first occurred in 1992, when Plaintiff was asked to reimburse the Credit Union for personal telephone calls. The second occurred sometime between 1989 and 1996, when Plaintiff was late for work several times. He estimated, however, that she was late no more than five times during that period. Althoff testified that he had no problem with Plaintiff's work just before her leave of absence. In addition, other employees had engaged in more serious misconduct but were not fired.

At the time of her discharge, Plaintiff was taking Paxil, an anti-depressant, Depakote to help her sleep, and Valium and Trilafon for anxiety. She was also still seeing Dr. Patil. After her discharge, Plaintiff again became suicidal, and could not eat, sleep, or take care of herself. Although Dr. Patil suggested that she again be hospitalized, Plaintiff declined. In November of 1996, Dr. Patil took Plaintiff off Valium to prevent addiction. She took Paxil until June of 1998, when she began taking another anti-depressant, Zoloft. She continued to take Zoloft until Dr. Patil prescribed Wellbutrin. Up until the time of his deposition, Dr. Patil's diagnosis remained that Plaintiff suffered from major depression and post-traumatic stress disorder. Nevertheless, despite her afflictions, Plaintiff started working for St. Mary's Hospital in fall of 1997, and Dr. Patil placed no restrictions on her work there.

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court must decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir.1994). In reaching this decision, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden of establishing that no genuine issue of material fact exists rests with the movant. Jakubiec v. Cities Service Co., 844 F.2d 470, 473 (7th Cir.1988). However, neither the mere existence of some factual dispute between the parties nor the existence of some metaphysical doubt as to the facts is sufficient to defeat a motion for summary judgment. McCreary v. Libbey–Owens–Ford Co., 132 F.3d 1159, 1164 (7th Cir. 1997).

When confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the Seventh Circuit has noted: "A district court need not scour the record to make the case of a party who does nothing ... [C]ourts will not discover that the movants slighted contrary information if opposing lawyers sit on their haunches; judges may let the adversary system take its course." *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989).

With these principles in mind, the court now turns to the merits of the summary judgment motion. As an initial matter, the court notes that Plaintiff agrees that her claim under the ADEA should be dismissed. Accordingly, the court grants summary judgment on that count. Thus, only Plaintiff's ADA and retaliatory discharge claims remain.

### I. *Plaintiff's ADA claim*

The ADA prohibits covered employers from discriminating against qualified individuals with a disability. *Sutton v. United Airlines, Inc.*, —— U.S. ——, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (West 1999).

To invoke the protection of the ADA, the plaintiff must show that she suffers from a "disability" as that term is defined by the ADA. *Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 961 (7th Cir.1996). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Thus, to fall within

this definition, one must either (1) have an actual disability (subsection (A)); (2) have a record of a disability (subsection (B)); or (3) be regarded as having a disability (subsection (C)). *Sutton*, —— U.S. at ——, 119 S.Ct. at 2144.

To survive a motion for summary judgment on an ADA claim, a plaintiff must come forward with evidence to show that she could meet her ultimate burden of showing an ADA-recognized disability. *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 672 (7th Cir.1998). Determining whether the plaintiff suffers from a "disability" as defined by the ADA requires an individualized inquiry made on a case-by-case basis. *Sutton*, —— U.S. at ——, 119 S.Ct. at 2147; *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(j) (stating that "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").

The Credit Union argues that Plaintiff cannot meet her burden of proving that she is "disabled" as that term is defined by the ADA. In response, Plaintiff argues that she is disabled because she (1) falls within subsection (A) of the ADA's disability definition because her depression qualifies as an actual disability, or (2) falls within subsection (C) of the ADA's disability definition because Defendant regarded her as having a disability. The court examines each of these arguments in turn.

### A. *Whether Plaintiff falls within subsection (A) of the ADA's disability definition*

■ The court must first determine whether Plaintiff has presented evidence that would allow a reasonable jury to find that she falls within the ADA's definition of disability in subsection (A). In other words, she must show that she has a physical or mental impairment that substantially limits her in one or more major life activities. Plaintiff argues that she has satisfied this requirement by submitting

evidence that if she were not taking various anti-depressant medications, her depression would substantially limit one or more major life activity. The court must reject this argument in light of the Supreme Court's recent decisions in *Sutton v. United Airlines, Inc.,* —— U.S. ——, 119 S.Ct. 2139, —— L.Ed.2d—— (1999), and *Murphy v. United Parcel Serv., Inc.,* —— U.S. ——, 119 S.Ct. 2133, —— L.Ed.2d—— (1999).

Under these decisions, when determining whether an individual is "substantially limited" in a major life activity and, thus, "disabled" under the ADA, the court must consider the effects of any corrective measures that the person is taking, including medications. *Sutton,* —— U.S. at ——, 119 S.Ct. at 2146; *Murphy,* —— U.S. at ——, 119 S.Ct. at 2137. The Court explained that a "'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." *Sutton,* —— U.S. at —— - ——, 119 S.Ct. at 2146–47.

In this case, it is undisputed that Plaintiff suffers from a mental impairment that impacts her life. However, "'[m]any impairments do not impact an individual's life to the degree that they constitute disabling impairments.'" *Hamm v. Runyon,* 51 F.3d 721, 726 (7th Cir.1995) (*quoting* 29 C.F.R. pt. 1630, App., § 1630.2(j)). Moreover, in assessing Plaintiff's condition, the court must consider how Plaintiff's anti-depressant medications affected her. To support her claim that she is substantially limited, Plaintiff asserts that she must be medicated to function. She does not, however, dispute evidence that so long as she takes these drugs, she is capable of working and is not substantially limited in any major life activities. In fact, Plaintiff admits that the drugs she took "allowed her to function," and that she has been working since the fall of 1997 without any restrictions from her doctor.

Accordingly, in light of the Court's decisions in *Sutton* and *Murphy,* the court rejects Plaintiff's argument that she has an actual disability. *See also Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1197–98 (7th Cir.1997) (doubting that plaintiff was disabled under the ADA because he had recovered fully and was working full-time for another employer in a job similar to the one held at the defendant's business); *Korzeniowski v. ABF Freight Sys., Inc.,* 38 F.Supp.2d 688, 693 (N.D.Ill.1999) (rejecting plaintiff's claim that he was actually disabled under the ADA, stating that "[i]t would indeed be a bizarre notion of disability under which [the plaintiff] could claim statutory incapacity even while he is holding and performing an essentially equivalent job"). Defendant is therefore entitled to summary judgment on Plaintiff's ADA claim to the extent that it is based on her assertion that she has an actual disability under 42 U.S.C. § 12102(2)(A).

### B. *Whether Plaintiff falls within subsection (C) of the ADA's disability definition*

■ As an alternative theory of liability, Plaintiff alleges that Defendant discriminated against her in violation of section 12102(2)(C) of the ADA when it regarded her as disabled. A person is "regarded as" disabled within the meaning of the ADA if an employer mistakenly believes "either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* —— U.S. at ——, 119 S.Ct. at 2150. Under this theory, Plaintiff must do more than show that Defendant simply knew of her impairment, or even that her impairment prompted her termination. As the Seventh Circuit has explained:

> The [ADA] is not a general protection of medically afflicted persons. It protects people who are discriminated against by their employer ... either because they are in fact disabled or because their employer mistakenly believes them to be

disabled. "If the employer discriminates against them on account of their being ... ill, even permanently ill, but not disabled, there is no violation." *Christian v. St. Anthony Med. Ctr., Inc.,* 117 F.3d 1051, 1053 (7th Cir.1997), *cert. denied,* 523 U.S. 1022, 118 S.Ct. 1304, 140 L.Ed.2d 469 (1998).

Thus, to establish liability under this theory, Plaintiff must show not only that Defendant knew about her depression, but also that Defendant believed that it substantially limited a major life activity. *See Skorup v. Modern Door Corp.,* 153 F.3d 512, 515 (7th Cir.1998). "Major life activities" are those activities that the average person in society can perform with little or no difficulty, such as walking, seeing, hearing, speaking, breathing, learning, and working. *Miller v. Dept. of Corrections of the State of Illinois,* 916 F.Supp. 863, 866 (C.D.Ill.1996), *aff'd,* 107 F.3d 483 (7th Cir. 1997) (*citing Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1100 (S.D.Ga.1995)).

Moreover, "an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job." *Byrne v. Board of Educ.,* 979 F.2d 560, 567 (7th Cir.1992). In addition, "[i]ntermittent, episodic impairments are not disabilities." *Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995). Thus, even if an employer regarded its employee as having an otherwise qualifying impairment, the impairment would not constitute a "disability" under the ADA if the employer did not also perceive it as permanent.

In support of her claim that Defendant perceived her as disabled, Plaintiff points to the way she was treated during her hospitalization and upon her return to work. Plaintiff asserts that the rumor around the office was that she had suffered a "nervous breakdown," and that the atmosphere was "cold." In addition, Plaintiff claims that her supervisor, Senger, was unsympathetic during her hospitalization, pointing out that he did nothing to see that other employees contacted her despite Plaintiff's professed disappointment in their apparent lack of concern. In addition, Plaintiff asserts, Senger once acknowledged that he had not coped well with his own father's mental problems, which indicates that he was possibly prejudiced against the mentally ill. Finally, Plaintiff adds, around the time of her hospitalization, Senger began looking for flaws in her work habits. For example, he ordered Althoff to investigate whether Plaintiff had received personal telephone calls at work.

This evidence is not sufficient to support an inference that Plaintiff was regarded as disabled. · Even if Senger knew that she had recently suffered from depression and had been hospitalized, and even if this knowledge made Senger and some co-workers uncomfortable, it does not establish that they regarded her as disabled. They might have regarded her as impaired, but a perceived impairment alone does not rise to the level of a protected disability under the ADA. *See Duff v. Lobdell–Emery Mfg. Co.,* 926 F.Supp. 799, 807–08 (N.D.Ind.1996) (recognizing that employer must not just view employee as impaired, but must perceive impairment as substantially limiting a major life activity). Moreover, even if this evidence could support an inference that the Credit Union regarded Plaintiff as having a disability that substantially limited her, it does not support the conclusion that the Credit Union thought that this impairment was anything more than a temporary or periodic occurrence.

Plaintiff does present evidence that she was treated worse than other employees, and that her alleged inadequate performance and insubordination were not the real reasons she was fired. From that, Plaintiff argues, a jury could infer that Senger harbored a prejudice based on her mental illness. However, even if Plaintiff could prove that Senger was hostile toward Plaintiff because of her illness and consequent leave of absence, that hostility does not establish that he regarded her as

**920**

having a physical or mental impairment that substantially limited a major life activity. *See Skorup,* 153 F.3d at 515–16 (finding evidence that employer was "flustered" and "angry" about employee's doctor-imposed work restrictions did not establish that employer regarded her as disabled). Moreover, even the timing of the decision to fire her-just weeks after her return from medical leave—is not enough to establish that the Credit Union regarded her as disabled. As the Seventh Circuit has explained, that an employer fires an employee shortly after an illness does not by itself demonstrate that the employer must have regarded the employee as disabled. *Harrington,* 122 F.3d at 461.

In sum, the court finds that Plaintiff has failed to create a genuine issue of material fact as to whether she is disabled or was perceived to be disabled under the ADA. Accordingly, the Credit Union's motion for summary judgment on Plaintiff's ADA claim is granted.

### II. *Plaintiff's Illinois State Law Retaliation Claim*

Plaintiff has additionally alleged that Defendant fired her in anticipation that she would file a worker's compensation claim. Having granted summary judgment on her ADEA and ADA claims, there is no federal claim pending before this court. However, the court, in its discretion, will accept supplemental jurisdiction over Plaintiff's state law claim of retaliatory discharge because that claim is easily disposed of on summary judgment. *See City of Chicago v. International College of Surgeons,* 522 U.S. 156, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (recognizing that pendent jurisdiction is a matter of discretion).

Plaintiff asserts that although she never intended to file a worker's compensation claim, Defendant feared that she would, and fired her as a result. In support of that assertion, Plaintiff points out that Senger asked both her and her doctor about the cause of her illness. In addition, she claims that the Credit Union was unhappy about worker's compensation claims that other employees had filed in the past. From that, Plaintiff asserts, a jury could infer that the Credit Union feared that she too would file a claim, and therefore fired her before she had the chance.

Plaintiff is correct that an employer may not fire someone to prevent her from filing a worker's compensation claim. *See Cannella v. Cordell Enter.,* 980 F.Supp. 272, 274 (N.D.Ill.1997); *Richardson v. Illinois Bell Tel. Co.,* 156 Ill.App.3d 1006, 109 Ill.Dec. 513, 510 N.E.2d 134, 137 (1987); *Wolcowicz v. Intercraft Industries Corp.,* 133 Ill.App.3d 157, 88 Ill.Dec. 431, 478 N.E.2d 1039, 1042 (Ill.App.Ct.1985). Nevertheless, her claim that the Credit Union did so in her case is pure speculation. Plaintiff admits that she never intended to file a claim, never told anyone at the Credit Union that she would file a claim, and never so much as suggested that her illness was work related. Moreover, there is no evidence that her doctor told Senger that Plaintiff's depression was caused by anything but personal problems. In sum, there is simply no evidence that the Credit Union believed that Plaintiff intended to file a claim, let alone that this alleged belief prompted her discharge. Accordingly, there is no evidence from which a reasonable jury could infer that the Credit Union fired her to prevent her from filing a claim. *See Roger v. Yellow Freight Sys. Inc.,* 21 F.3d 146, 149–50 (7th Cir.1994) (requiring "[f]actual support that the employer was informed or in some way found out about the plaintiff's intent to pursue relief under the [Illinois Worker's Compensation] Act" to sustain retaliatory discharge claim). The Credit Union is therefore entitled to summary judgment on this claim as well.

### CONCLUSION

Defendant's Motion for Summary Judgment (# 23) is GRANTED. This case is terminated.